(No. 33226.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* GEORGE JACKSON (Impleaded), Plaintiff in Error.

*Opinion filed October 25, 1954—Rehearing denied Dec. 20, 1954.*

JOSEPH E. CLAYTON, JR., of Chicago, (R. EUGENE PINCHAM, of counsel,) for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and JOHN GUTKNECHT, of Chicago, (FRED G. LEACH, JOHN T. GALLAGHER, RUDOLPH L. JANEGA, ARTHUR F. MANNING, and FRANK G. WHALEN, of counsel,) for the People.

Mr. JUSTICE SCHAEFER delivered the opinion of the court:

The defendant, George Jackson, together with William McWilliam and Albert Stubblefield, was indicted in the criminal court of Cook County for obtaining $1100 from Royal G. Madison by means of the confidence game. McWilliam and Stubblefield were not apprehended. Jackson was tried by the court without a jury, found guilty, and sentenced to imprisonment in the penitentiary for a term of not less than two nor more than five years. He prosecutes this writ of error.

On January 17, 1953, about 11:00 A.M., Royal G. Madison, the complaining witness, made a deposit to his account with a bank in Morgan Park. From the bank he drove his automobile to 111th Street and Vincennes Avenue. He got out of the car and, as he returned to it the defendant accosted him, and inquired whether there was an employment agency in Morgan Park. According to Madison, defendant told him that he had just arrived from Jamaica and Trinidad, gave his name as George, and spoke in a "foreign fashion." Madison replied that he knew of

no employment agency in Morgan Park. At this juncture, a stranger, "short in stature and kind of wide," appeared. Madison suggested that defendant inquire of the stranger. Defendant asked, instead, if there was any place in Morgan Park where he could get a woman. The short man seemed to know, and the defendant asked Madison if he wanted to go along, saying that he would pay. The short man said, "Come on, I got a buddy up here; we will get in his car." The three, Madison, defendant and the short man, went to a Buick automobile and drove to 115th Street and Vincennes Avenue where the driver stopped the car, and left to make arrangements.

In the meantime, the short stranger had produced a deck of cards to demonstrate a game called "chasing the jack." In the demonstration process, defendant lost about $50, and paid off. The driver returned and told Madison that the defendant could neither read nor write, adding, "This guy is loaded; let's take him." The "game" was resumed. Upon losing an additional four dollars, defendant seemed to become irritated and said, "I don't want to play for chicken feed any more. Let's play for fifteen hundred dollars." The short stranger asked Madison, "How much money you got?" Madison said, "I got twenty dollars." He then disclosed, "I got a bank book." The short man asked, "How much have you got in the bank book?" Madison replied, "Eleven hundred dollars." The short man suggested, "Show Jackson the bank book." Jackson then said, "Me don't know anything about a bank book; me only know cash money." The driver asked, "Where is the bank?" and when Madison told him, said, "Come on, I will drive you down there."

The driver drove Madison to the bank and accompanied him as he withdrew $1100 in eleven $100 bills. They returned to 115th Street and Vincennes Avenue. The card game was continued. It appears that Madison gave the $1100 to the driver to hold. Madison testified that this

time when the cards were produced, the driver told him the location of the black jack, but when Madison turned the indicated card the black jack "wasn't where it was supposed to be. I turned the card. At that time Jackson reached over and snatched the money out of the driver's hand. At no time did Jackson produce his money, always my money." Madison testified further that the short man, who had apparently bet $400, did not have that amount, · but "let on like he didn't know how to write," and asked Madison to write out and give defendant a promissory note for $400 payable to defendant, which he did.

Madison's version of the subsequent circumstances is that defendant said he had a sister in Trinidad and asked him, Madison, to "send this money" to her; that he agreed; that defendant gave him the sister's address and directed him to write her name on an envelope; that defendant took the money which he had won and put it in the envelope, that he, Madison, wrote his own name and address on the envelope, "so I could still beat him out of the money he had won;" that they then drove to 118th Street and Vincennes Avenue where the defendant "produced the letter and supposedly placed it in the mail box." Three days later, when Madison did not receive the letter which he had addressed to himself, he notified the police of the loss of his money.

Police officer Norman Simms testified that Madison first stated that he had been robbed by three men; later, he admitted the loss of his money by means of the confidence game.

Defendant testified that he was employed as a waiter by a railroad company; that he had engaged in a gambling game with Madison in February; that in the beginning when he lost approximately $200 to a man he did not know, Madison was present; that Madison and the person he lost the money to left; that upon their return he started gambling again, won some money, but did not get all of

the money he had bet and won in the game; that Madison gave him a check for the difference, and that the check was no good. On cross-examination, Jackson denied that he told Madison that he was from Jamaica, or acted as though he could not speak English very well, it being the only language he could speak; he also denied that he told Madison that he had just come off the boat and that he had a ·sister in the West Indies.

Defendant contends that the evidence is insufficient to sustain the judgment. Section 98 of division I of the Criminal Code (Ill. Rev. Stat. 1953, chap. 38, par. 256,) states: "Every person who shall obtain or attempt to obtain from any other person or persons any money, property or credit by means or by use of any false or bogus check or by any other means, instrument or device commonly called the confidence game shall be imprisoned in the penitentiary not less than one year nor more than ten years." The statute was designed to reach the class of offenders known as "confidence men," who practice swindling schemes, "as various as the mind of man is suggestive," upon unwary victims. (*People* v. *Gould,* 363 Ill. 348; *Morton* v. *People,* 47 Ill. 468.) Any fraudulent scheme, trick or device whereby a swindler wins the confidence of his victim and then cheats him out of his money or property by taking advantage of the confidence reposed in him is a confidence game. (*People* v. *Sceri,* 407 Ill. 90; *People* v. *Priola,* 395 Ill. 296; *People* v. *Bimbo,* 369 Ill. 618.) The gist of the crime is a trust or confidence reposed in the swindler and betrayed by him as a means of obtaining the victim's money or property. (*People* v. *Burley,* 357 Ill. 584; *People* v. *Fosnacht,* 334 Ill. 351.) The form of the transaction is immaterial. *People* v. *West,* 406 Ill. 249.

Defendant argues that his questions concerning the location of an employment office and where he could find a woman were no more than requests for information; that since the record is silent as to the identity of the short

man and the driver, and contains no evidence even tending to show that he was acquainted with them, the necessary conclusion is that they were strangers; that there was no invitation or inducement to Madison to participate in the gambling game; that he was not entrapped in an effort to regain some minute initial wager; that no means were employed either by defendant or the strangers to induce Madison to withdraw his money from the bank; that no one assured Madison that his participation in the game would be satisfactory and profitable; that he took a voluntary risk and lost, and, further, that he reposed no confidence in defendant, or anyone else.

The evidence fully warrants the conclusion that the defendant and the two strangers were confederates, that they gained Madison's confidence by an ancient technique, and thereafter betrayed the confidence so reposed. The pattern is familiar: an innocuous inquiry by a stranger put to an accommodatingly avaricious, prospective victim; an ensuing conversation; the fortuitous appearance of strangers offering assistance; the production of a deck of cards, the speedy separation by one confederate from another of a relatively modest sum of money; the lure of easy money, the assurance of success, and the final loss by the victim of a large sum of money or property. Here the prosecution's evidence shows that the defendant, posing as a recent arrival from the West Indies, and the first stranger, engaged in conversation with Madison, a stranger to them; that a deck of cards was produced, and within a few minutes defendant was relieved of $50; that Madison was led to believe defendant was a recently arrived ignorant West Indian with substantial funds which could easily be won in a card game; that defendant proposed to bet $1500 upon the turn of a single card; that the cooperative second stranger, whose automobile had been parked conveniently close by, took Madison to the bank where he withdrew $1100; that the strangers or confederates imbued Madison

with confidence that he could beat Jackson at cards, and that this quickly won confidence was even more speedily betrayed.

Our attention is directed to the facts that Madison never gave the money to defendant; that the latter did not ask him for it but that, on the contrary, Madison gave his money to the driver of the car, and that "Jackson just reached over and snatched the money out of the driver's hand." But authorities such as *People* v. *Gallowich,* 283 Ill. 360, *People* v. *Rallo,* 293 Ill. 304, and *People* v. *Parker,* 356 Ill. 138, are not in point. In the first of these cases, the complaining witness did not repose confidence in the defendant, who took the money from her by force. In the second, the defendant drew a revolver on the complaining witness and took the money from her. And in the third, the defendant snatched the money from the complaining witness's hand and ran away. In each of the three cases, the money was taken by force. In the present case, defendant and the two strangers won the confidence of Madison. He exhibited his confidence in them by returning to the bank and withdrawing $1100 and turning it over to one of the strangers to hold. Defendant snatched the $1100 from the confederate's hand,—not from Madison's.

The evidence sustains the conviction.

Defendant also insists that the transaction upon which his conviction rests does not come within the confidence game statute, but rather within section 100 of division I of the Criminal Code (Ill. Rev. Stat. 1953, chap. 38, par. 258,) which provides: "Whoever, by the game of 'three card monte,' so called, or any other game, device, sleight of hand, pretensions to fortune telling, trick or other means whatever, by use of cards or other implements or instruments, fraudulently obtains from another person property of any description, shall be punished as in case of larceny of property of like value." This offense may be punished either as in cases of grand or petit larceny,—either as a

felony punishable by imprisonment in the penitentiary or as a misdemeanor punishable by confinement in the county jail or by a fine not exceeding $100. (Ill. Rev. Stat. 1953, chap. 38, par. 389.) The confidence game is a felony punishable by a term of from one to ten years in the penitentiary. Confidence won and betrayed is an element of the offense under the confidence game statute; it is not an essential ingredient of the offense under section 100 of division I. Under the latter statute, the essential element is that the money or property must be obtained by means of a trick or device operating at the time and but for which the victim would not have parted with his money; the element of confidence obtained and betrayed is unnecessary. The use of cards in the perpetration of the offense does not require an indictment under section 100 of division I of the Criminal Code. The question presented was resolved adversely to defendant in *People* v. *Shepard,* 358 Ill. 338, involving similar facts. Implicit in the affirmance of the judgment in that case was the determination that section 98 rather than section 100 of the Criminal Code controlled. The sole support for defendant's contention is the dissenting opinion in the *Shepard case.*

Finally, defendant contends that the judgment of conviction (1) denied him the equal protection of the laws guaranteed him by the fourteenth amendment to the Federal constitution and (2) places him in double jeopardy under section 10 of article II of the constitution of this State. Neither of these questions was raised in the criminal court, and defendant is not in a position to present them here. *People* v. *Bute,* 396 Ill. 588.

The judgment of the criminal court of Cook County is affirmed.

*Judgment affirmed.*