# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### August 17, 2004 Session

## STATE OF TENNESSEE v. STANLEY EARL CATES

**Appeal from the Criminal Court for Anderson County**
**No. A2CR0086     James B. Scott, Jr., Judge**

---

**No. E2003-02648-CCA-R3-CD - Filed December 20, 2004**

---

The Appellant, Stanley Earl Cates, was convicted by an Anderson County jury of aggravated robbery and sentenced to eight years imprisonment. On appeal, Cates raises the following issues for our review: (1) whether the trial court erred by denying his motion to suppress, (2) whether the evidence was sufficient to support the jury's verdict, (3) whether the trial court erred by requiring him to provide a voice exemplar before the jury, (4) whether the trial court erred in giving sequential jury instructions, and (5) whether the trial court abused its discretion by refusing to sentence him as an especially mitigated offender. After review, we find that Cates' issues are without merit. Accordingly, the judgment of the Anderson County Criminal Court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

DAVID G. HAYES, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ALAN E. GLENN, JJ., joined.

J. Thomas Marshall, Jr., Office of the Public Defender, Clinton, Tennessee, for the Appellant, Stanley Earl Cates.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Michelle Chapman McIntire, Assistant Attorney General; and Jan Hicks, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### Factual Background

At approximately 5:30 p.m. on January 23, 2002, a man brandishing a rifle and wearing "a black ski mask and a maroon fleece jacket" entered the Lake City Dollar General Store. He approached the store manager, Charlene Seiber, carrying a white plastic bag, and demanded, "Fill it up with all your money." She asked if he was kidding, and the man "cocked the gun back" and again ordered her to put money in the bag. She went to the register, pressed the silent alarm, and

began filling the bag with money. Seiber testified that she placed approximately two thousand dollars in the bag. Seiber described the truck that the robber drove as a white Ford F-150 with a "tool box in the back." According to Seiber, the truck drove onto the interstate and traveled toward Clinton. After the robber exited the store, Seiber locked the doors and called 911. At trial, Seiber identified the Appellant as the robber.

Lynetta Delk, a customer inside the store when the robbery occurred, also observed a white truck exiting the store parking lot. Sandra Seiber, also a customer, ran outside to obtain the license plate number of the robber's truck following his flight from the store. She was able to obtain the letters and numbers from the plate but was unable to identify the state of issuance. At trial, Sandra Seiber made a voice identification of the Appellant as the robber.

Patricia Lay, the manager of the Comfort Inn in Clinton, testified that the Appellant checked into the motel at approximately 5:40 p.m. She stated that it would take "[m]aybe ten minutes" to drive from the Dollar General Store in Lake City to the Comfort Inn.

The Appellant's stepfather, Willie Grant, was advised that the police were looking for his stepson. While en route to look for the Appellant at a family cabin in Gatlinburg, Grant observed the Appellant's truck in the Comfort Inn parking lot. The truck, which displayed a Kentucky registration, was co-registered to Grant and the Appellant. Around 12:30 a.m., Grant phoned the police from a Texaco gas station and informed them that he had located the Appellant's vehicle. Chief Jim Shetterly of the Lake City Police Department then called Officer Foshino, also of the Lake City Police Department, at home and requested that he meet him at the gas station. After speaking with Grant, the two officers went to the Comfort Inn and confirmed the truck's ownership and that the Appellant was registered as a guest at the motel. Moreover, the license plate number matched that given by Sandra Seiber. Upon looking through the truck window, Officer Foshino saw a ski mask. The officers then went back to the gas station to speak with Grant, who gave them a key to the truck. Upon returning to the truck, Foshino opened the door and retrieved the mask.

Thereafter, Officer Foshino, Chief Shetterly, and three Clinton Police Officers, David Moore, Danielle Duncan, and Vaughan Becker, devised a plan to have the Appellant leave his motel room so they could take him into custody. Officer Duncan phoned the Appellant in his room and identified herself as "Susan at the front desk." She informed the Appellant that his truck had been hit by a maintenance man and that he needed to check the damage to his vehicle. The Appellant exited his room and was arrested at the bottom of the stairwell by awaiting officers.

Officer Foshino then took the Appellant to the motel lobby, where the Appellant was placed under arrest and provided *Miranda* warnings. The Appellant informed the officers that the rifle used in the robbery was in the tool box of his truck, and he gave the officers the key to unlock it. The rifle, which had a distinctive drop and slide cocking mechanism, was taken into evidence. The Appellant also agreed to show Officer Foshino where the money was located in his motel room. The Appellant and Officer Foshino proceeded to the room, and the Appellant gave Foshino the key to the room. Inside the room, officers found approximately $1,680.

The Appellant was then transported to the Anderson County Jail. Officer Foshino again advised the Appellant of his rights, and the Appellant stated that he wished to tell "his side of the story." The Appellant signed a waiver of rights form and prepared a written statement confessing his involvement in the robbery.

On March 12, 2002, an Anderson County grand jury indicted the Appellant for aggravated robbery. The Appellant filed a motion to suppress the statements made to police and the evidence obtained from his truck and motel room. Following a suppression hearing, the motion was denied. Trial was held, and the Appellant was found guilty as charged. Thereafter, a sentencing hearing was conducted, and the trial court sentenced the Appellant to eight years confinement as a Range I standard offender. This appeal followed.

## ANALYSIS

### I. Motion to Suppress

In reviewing the denial of a motion to suppress, this court looks to the facts adduced at the suppression hearing which are most favorable to the prevailing party. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). In considering the evidence presented at the hearing, this court extends great deference to the fact-finding of the suppression hearing judge with respect to weighing credibility, determining facts, and resolving conflicts in the evidence. *Id.; see also State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001). Indeed, these findings will be upheld unless the evidence preponderates otherwise. *Daniel,* 12 S.W.3d at 423.

### A. Pre-arrest Search

First, the Appellant contends that "the search of his truck prior to his arrest was not based on probable cause and was conducted without the consent of anyone authorized to permit the search by police." Specifically, he argues that he "had exclusive use of the truck and made payments on it. His stepfather only had a key as a safety measure against the [Appellant] locking himself out. There is no evidence that [the Appellant] ceded authority, common or otherwise, over his vehicle to his stepfather." The State argues that the officers "reasonably believed that [the Appellant's stepfather had] authority to consent to a search of the vehicle."

Both the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, a warrantless search is considered presumptively unreasonable and is, thus, violative of constitutional protections. *State v. Walker*, 12 S.W.3d 460, 467 (Tenn. 2000). Our supreme court has noted that "it is, of course, well settled that one of the exceptions to the warrant requirement is a search conducted pursuant to consent." *State v. Bartram*, 925 S.W.2d 227, 230 (Tenn. 1996) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-2044 (1973); *State v. Jackson*, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993)). "The sufficiency of consent depends

largely upon the facts and circumstances in a particular case." *Jackson*, 889 S.W.2d at 221. The prosecution bears the burden of proving that the Appellant freely and voluntarily gave consent. *State v. McMahan*, 650 S.W.2d 383, 386 (Tenn. Crim. App. 1983). We further observe that "'[t]he existence of consent and whether it was voluntarily given are questions of fact.'" *State v. Ashworth*, 3 S.W.3d 25, 29 (Tenn. Crim. App. 1999) (quoting *McMahan*, 650 S.W.2d at 386).

Generally, consent may be given "either by the individual whose property is searched or by a third party who possesses common authority over the premises." *State v. Ellis*, 89 S.W.3d 584, 592 (Tenn. Crim. App. 2000) (citations omitted). The United States Supreme Court has defined common authority as the

> mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993 n.7 (1974); *see also Bartram*, 925 S.W.2d at 231. However, this court has previously explained that the State may satisfy its burden of proof in this regard either by demonstrating that the third party in fact possessed common authority as defined above or, alternatively, by demonstrating that the facts available to the searching police officers would have warranted "'a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Ellis*, 89 S.W.3d at 593 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 188-89, 110 S. Ct. 2793, 2801 (1990)). Notably, the United States Supreme Court has opined that the

> Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.

*Rodriguez*, 497 U.S. at 186, 110 S. Ct. at 2800.

Following the conclusion of the suppression hearing, the trial court found that the State had established that the Appellant's stepfather possessed the authority to consent to the search of the vehicle because "[t]he man had a key, gave them entrance to it, voluntarily came down and located it." We conclude that the evidence does not preponderate against the trial court's findings. The Appellant's stepfather was a registered co-owner of the vehicle, and he was in possession of a key. Moreover, the stepfather had co-signed the loan for the purchase of the truck. Officer Foshino testified, "Apparently, [the Appellant] has access to the truck and drives the truck all the time or whenever it's not needed by [his stepfather]." Therefore, the officers could have reasonably determined that the Appellant's stepfather had the authority to give consent to the officers to search the vehicle.

-4-

The Appellant also argues that the officers did not have probable cause to search his truck. However, the Appellant, in his brief, focuses solely upon the argument that his stepfather lacked authority to consent to a search of the truck. Because the Appellant cites to no legal authority to support this assertion, the issue is waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. R. Ct. Crim. App. 10(b). Nonetheless, witnesses at the scene described the vehicle the robber was driving and gave police the license plate number. The Appellant's truck and its license plate number matched this information. The robbery occurred around 5:30 p.m. The driving time from the Dollar General Store to the motel is approximately ten minutes. At approximately 5:40 p.m. on the same day, the Appellant registered as a guest at the motel. Moreover, Officer Foshino testified that, prior to opening the truck door, he observed a ski mask in plain view "sticking out from underneath" the armrest. A vehicle is subject to a warrantless search on probable cause if the vehicle contains evidence of the crime. *State v. Leveye*, 796 S.W.2d 948, 952 (Tenn. 1990); *State v. Donald Curtis Reid*, No. M1999-00058-CCA-R3-CD (Tenn. Crim. App. at Nashville, Apr. 28, 2000).

## B. Arrest

Next, the Appellant argues that, even though he was arrested in a motel hallway, a public place, the police were still required to obtain a warrant for his arrest. The Appellant claims the arrest is illegal because he did not leave his motel room voluntarily but was coerced by the officers' deception thereby violating the rule in *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371 (1980), that absent exigent circumstances a warrant is required to make an arrest in a suspect's home[1] for a routine felony.

Apparently, the facts of this case present an issue of first impression in Tennessee. We find the case of *United States v. Vasiliavitchious*, 919 F. Supp. 1113 (N.D. Ill. 1996), to be persuasive on this issue.[2] In *Vasiliavitchious*, law enforcement officers went to Vasiliavitchious' home to arrest him without a warrant. *Id.* at 1115. The officers knocked on Vasiliavitchious' apartment door and identified themselves as police officers. *Id.* Vasiliavitchious opened the door and stood in the open doorway of the apartment. *Id.* The officers falsely told him that a man had broken into his car and directed him to come down to the parking lot to see if any item was missing from his car. *Id.* This tactic was deliberate and designed to allow officers to make the arrest well away from Vasiliavitchious' home. *Id.* Vasiliavitchious believed the misrepresentation and followed the officers to the parking lot where he was arrested. *Id.*

In upholding Vasiliavitchious' arrest and concluding that no Fourth Amendment violation occurred, the court reasoned:

---

[1] The same protection enjoyed by a citizen in his home is extended to a citizen in a "hotel room[] and other temporary living spaces." *State v. Ross*, 49 S.W.3d 833, 840 (Tenn. 2001).

[2] The Appellant relies on the case of *People v. Reyes*, 98 Cal. Rptr. 898 (Cal. Ct. App. 2000). However, we find that *Reyes* is not dispositive of the issue presented because in *Reyes* there was no probable cause to arrest the Appellant prior to the employment of a police ruse.

Vasiliavitchious misconstrues the purpose and policy behind the *Payton* rule. The chief of evils against which the Fourth Amendment is directed was the unauthorized physical entry of the home. *Payton*, 445 U.S. at 585. The purpose of requiring officers to obtain a warrant before entering a suspect's home to effectuate an arrest is to protect the "privacy and the sanctity of the home." *Id*. at 588. The Fourth Amendment has thus drawn a firm line at the entrance to a person's home. *Id.* at 590.

The issue here is not whether the officers circumvented the warrant requirement by drawing the defendant out of his home, but whether this circumstance against which the Fourth Amendment guards was violated. *Payton* states that an officer may not cross the threshold of the home to make an arrest without a warrant. The officer never entered Vasiliavitchious' home. He knocked at the door, identified himself as a police officer and waited outside the apartment for Vasiliavitchious to come outside. The privacy and sanctity of the home were thus respected by using the ruse. The ruse, in fact, preserved rather than damaged the sanctity of the home. There is no *Payton* violation.

Vasiliavitchious argues the ruse is improper because he did not voluntarily consent to leaving his home and the wanton use of misrepresentations by police officers should not be sanctioned. The officers' tactics can only be found to violate the Fourth Amendment if the ruse was improper in and of itself. However, on its own, a police ruse cannot be considered bad.[3] Neither precedent nor policy support condemnations of the ruse in this case.

First, the courts have found no constitutional violation when police officers use tactics of misinformation to solve crimes. Most prominent is the Supreme Court's 1969 decision in *Frazier v. Cupp* in which Justice Marshall held that an officer's lie to the defendant that his co-conspirator had confessed was insufficient to make an otherwise voluntary confession inadmissible. *Frazier v. Cupp*, 394 U.S. 731, 739, 89 S. Ct. 1420, 1425 (1969). The ruse at issue in *Frazier* was substantially more serious in its scope and its consequence than the ruse here. The defendant in *Frazier* was tricked into making a full confession. In this case, the officer's use of trickery only obtained Vasiliavitchious' arrest, an inevitable consequence since the officers had probable cause. Unsurprisingly the courts have upheld the use of subterfuge to trick a defendant into leaving his home on many occasions under circumstances very similar to the ones here. *People v. Witherspoon*, 576 N.E.2d 1030, 1036 (Ill. App. Ct. 1991) ("The use of deception to lure a defendant from his home in order to effectuate an arrest without a warrant has been held not to violate

---

[3]Indeed in an entrapment defense case in Tennessee, the jury is instructed that law enforcement officials may use fraudulent representations, coercive tactics, artifice, and stratagem in apprehending those predisposed to committing criminal activity. *See* T.P.I. Crim. 40.04 (7th ed. 2000).

fundamental fairness."); *People v. Moore*, 434 N.E.2d 300, 303 (Ill. App. Ct. 1981) (officer's use of deceptive tactics to lure defendant out of his home to make an arrest did not violate fundamental fairness nor illegally circumvent the Payton rule); *People v. Houston*, 344 N.E.2d 641, 644-45 (Ill. App. Ct. 1976), *cert. denied sub nom. Gibson v. Illinois*, 429 U.S. 1109, 97 S. Ct. 1143 (Ill. 1977) (officer's use of subtle subterfuge, merely disguising the nature of the crime he was investigating, was not so offensive to the Constitution to require proscription); *People v. Trudell*, 219 Cal. Rptr. 679, 683 (Cal. Ct. App. Dist. 1985) (consensual decision to leave residence is not a prerequisite to a valid arrest if the arrest is based on probable cause and does not require an invasion of a residence).

Second, the use of subterfuge in and of itself does not offend the conscience. If the officer had a warrant and thus had the right to enter the home, yet still resorted to a ruse to get Vasiliavitchious out of his home, no motion would have been seriously pursued here. It is unlikely that any defendant, knowing an officer had every right to enter his home to make the arrest, would assert that his rights were violated because a ruse was used to secure the inevitable result of his arrest. It is inconceivable that a court would accept the assertion.

. . .

Third, were it necessary to decide whether the ruse is reasonable in itself and under the circumstances here, I would hold that it was. Why did the officers resort to a ruse when it was legally unnecessary? The officers testified that the ruse was used for safety considerations. There is no reason to doubt the officers' testimony since they had no need to use the ruse, Vasiliavitchious could have been arrested in his doorway, or with a little work, the officers could have obtained a warrant. In fact, by not getting a warrant, the officers surrendered something of value to them. They gave up access to the apartment and the benefits of plain view and possibly a limited search which might have turned up incriminating evidence. The officers also took the chance that evidence might have been destroyed by others before they were able to return with a warrant.

The use of subterfuge may be reasonable policy in many situations. By removing an arrestee from his home where others might be present, danger to the arresting officers and the arrestee is reduced. So too is the trauma to family members and friends who may be present in the home to witness the arrest.

*Id.* at 1116-18.

In the present case, like in *Vasiliavitchious*, the police never entered the Appellant's motel room. Rather Sergeant Danielle Duncan phoned the Appellant in his room and "told him that [she] was an employee of the motel, that his vehicle had been hit by . . . a maintenance man . . . and [she]

needed him to come out and check the damage to his vehicle." The Appellant was arrested in the motel hallway and no attempt was made to search his room at that time. Moreover, the ruse in this case was also used for safety considerations. Officer Foshino testified, "[W]e were concerned about making an arrest for this serious crime involving a weapon in a motel that's populated with guests." While the testimony is conflicting as to whether the rifle used in the robbery was discovered before or after the Appellant's arrest, such is irrelevant as the trial court aptly noted, "[W]ho knows how many weapons a person has?" In *Howard v. State*, this court reasoned:

> [W]hen the occasion for arrest arises while the police are already out in the field investigating the prior or ongoing conduct which is the basis for the arrest, there should be a far greater reluctance to fault the police for not having an arrest warrant. Here, the presumption should be in favor of a warrantless arrest rather than against it, as the probabilities are high that it is not feasible for the police to delay the arrest while one of their number leaves the area, finds a magistrate and obtains a warrant, and then returns with it.

> There is yet another reason, . . . [other than preservation of evidence], why officers in the field must often take immediate action even though the person to be arrested could probably be found later and arrested pursuant to a warrant obtained in the meantime. Not infrequently, a prompt entry to arrest is called for in order to minimize the risk that someone will be injured or killed. Sometimes the risk is to another person who is also in the premises to be entered, such as an undercover agent or informant, a possible hostage, or an individual the person to be arrested knows has cooperated with the police.

> Our courts have long recognized the need of officers to act with promptness in enforcing the law. This duty is circumscribed only by the requirement that the officer act in good faith, and, in the event of an arrest, upon reasonable cause.

*Howard v. State*, 599 S.W.2d 280, 282-83 (Tenn. Crim. App.), *perm. to appeal denied*, (Tenn. 1980). In accordance with the foregoing authorities, we conclude that no Fourth Amendment violation occurred.

## C. Post-Arrest Search

Finally, the Appellant contends that "he was illegally arrested without an arrest warrant leading to an involuntary statement and involuntary consent to search his truck and motel room." Because we have previously concluded that the Appellant's arrest was constitutional, this argument is without merit. Nonetheless, the record demonstrates that the Appellant was advised of his *Miranda* rights before he made an oral statement to police at the scene, and he was again *Mirandized* at the police station prior to making a written statement. Additionally, the record reveals that the Appellant voluntarily assisted the police in recovering the stolen money and the weapon used in the

robbery. Accordingly, the Appellant's statements and the evidence found in his truck were admissible against him at trial.

## II. Sufficiency of the Evidence

The Appellant contends that the evidence was insufficient to support his conviction for aggravated robbery, a class B felony. Specifically, he argues that "[w]ithout the ability to consider [his] statement, the mask and the rifle seized from his motel room, no reasonable trier of fact could have found [him] guilty of aggravated robbery beyond a reasonable doubt."

A jury conviction removes the presumption of innocence with which a defendant is cloaked and replaces it with one of guilt, so that, on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Likewise, it is not the duty of this court to revisit questions of witness credibility on appeal, that function being within the province of the trier of fact. *State v. Holder*, 15 S.W.3d 905, 911 (Tenn. 1999); *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Instead, the Appellant must establish that the evidence presented at trial was so deficient that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994). Moreover, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

As indicted, aggravated robbery is defined as robbery accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon. Tenn. Code Ann. § 39-13-402(a)(1) (2003). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2003).

This court has previously held that, for purposes of reviewing the sufficiency of the convicting evidence, we consider even evidence that we find to be inadmissible. *State v. Longstreet*, 619 S.W.2d 97, 100-01 (Tenn. 1981). Thus, we would consider the admitted evidence that was gained as a consequence of the warrantless arrest, even if we had agreed that such evidence was inadmissible. Furthermore, even apart from such evidence, there was direct eyewitness testimony that inculpated the defendant. The Appellant was identified as the robber by Charlene Seiber and Sandra Seiber. Additionally, the Appellant's truck and license plate number matched the information given by Sandra Seiber. Accordingly, this issue is without merit.

**III. In-Court Voice Identification**

The Appellant asserts that the trial court committed reversible error when it ordered him to speak in front of the jury so that Sandra Seiber, a witness to the robbery, could compare the Appellant's voice to that of the robber. The Appellant was directed to say, "Put the money in the bag," and to say more definitively, "I said put the money in the bag." After the Appellant's compliance with this directive, Sandra Seiber then identified the Appellant as the robber.

The Appellant now complains that the forced utterance of these phrases violated his right to remain silent. It is undisputed that an appellant in a criminal case has the constitutional right to remain silent and cannot be compelled to testify. However, "[a] defendant may be compelled to give evidence which does not have testimonial significance because such evidence is not protected by the constitutional privilege against self-incrimination." *State v. Meeks*, 867 S.W.2d 361, 376 (Tenn. Crim. App. 1993) (citations omitted). The *Meeks* court reiterated the well-settled principle that "the privilege against self-incrimination was not violated by compelling a defendant to speak and to utter words purportedly uttered by the assailant in order for witnesses to consider the utterances for identification purposes." *Id.* (citing *United States v. Wade*, 388 U.S. 218, 222-23, 87 S. Ct. 1926, 1930 (1967)).

The Appellant contends that the statements made by him had testimonial significance. Nonetheless, the Appellant acknowledges that this court approved such a procedure in *State v. Thomas Lewis*, No. 02C01-9707-CR-00254 (Tenn. Crim. App. at Jackson, May 20, 1999), but argues that the precedent relied upon in that case does not support the trial court's ruling. We disagree. In accordance with the court in *Thomas Lewis*, we conclude that the utterances made by the Appellant during the trial constituted voice exemplars. As such, the statements made by the Appellant did not rise to the level of testimony and did not violate his right to remain silent. *Id.*

The Appellant also contends that the phrase he was ordered to speak was inconsistent with a prior statement given by Seiber to the police. Moreover, he submits that "[t]he trial court later remarked that the inconsistency might have made a difference in its ruling." He relies on the following passage from *Thomas Lewis* in support of this argument, "The Court would note, however, as suggested by the appellant, that when such voice exemplars became a useful or necessary part of a case, the preferred timing of obtaining these exemplars would be prior to the trial of the matter." *Id.* However, the remarks made by the trial court were to admonish trial counsel for not pointing out this discrepancy during Seiber's testimony and did not affect the validity of the ruling admitting the voice exemplar. While we agree with the court in *Thomas Lewis* that the preferred timing of obtaining this evidence would be prior to trial, our conclusion remains the same that the Appellant's right to remain silent was not violated. Moreover, we do not find that the utterances required of the Appellant during the trial and the nature of those utterances so prejudiced his trial as to require a reversal. *Id.* Error, if any, was harmless. *Id.* This issue is without merit.

## IV. Sequential Jury Instructions

The Appellant argues that the trial court erred in giving sequential jury instructions, *i.e.*, the jury was instructed not to consider a lesser included offense unless it acquitted the Appellant of the greater offense first. He asserts that insufficient authority exists for such an instruction and argues that it violates his right to trial by jury.

This argument was addressed in *State v. Joe A. Gallaher*, No. E2001-01876-CCA-R3-CD (Tenn. Crim. App. at Knoxville, June 25, 2003), and found to be without merit. In *Joe A. Gallaher*, a panel of this court reasoned:

> The defendant acknowledges that this court has held that sequential instructions are proper. *See State v. Raines*, 882 S.W.2d 376, 381-82 (Tenn. Crim. App. 1994); *State v. McPherson*, 882 S.W.2d 365, 375 (Tenn. Crim. App. 1994); *State v. Rutherford*, 876 S.W.2d 118, 119-20 (Tenn. Crim. App. 1993); *State v. Christopher S. Beckham*, No. 02C01-9406-CR-00107, (Tenn. Crim. App. at Jackson, Sept. 27, 1995), *rev'd on other grounds*, 1996 Tenn. LEXIS 484 (Tenn. July 8, 1996). However, he asserts that no authority is cited in these cases to allow such instructions. Also, he states that the Tennessee Supreme Court has "acquiesced in this Court's approval of the sequential instruction by not commenting on the question" in *State v. Mann*, 959 S.W.2d 503 (Tenn. 1997). We note that the court affirmed this court's ruling on sequential instructions and published that part of this court's opinion as an appendix. *Id.* at 517, 521.
>
> We acknowledge that this court's opinions do not contain separate authority for holding that sequential instructions are proper. And we acknowledge that some jurisdictions see due process problems relating to sequential instructions based on the wording of certain murder and manslaughter instructions. *See Edge v. State*, 414 S.E.2d 463, 466 (Ga. 1992); *Falconer v. Lane*, 905 F.2d 1129, 1136-37 (7th Cir. 1990). However, the defendant ignores the importance of the present state of the law in Tennessee.

*Id.* Like in *Gallaher*, we view the supreme court's publication of portions of this court's opinion in *Mann* as an appendix to mean more than the court's acquiescence in this court's opinion. *Id.* Therefore, based on controlling authority, we conclude that the trial court did not err in giving sequential instructions. *Id.*

## V. Especially Mitigated Offender

Finally, the Appellant argues that he should have been sentenced as an especially mitigated offender. A trial judge may find a defendant to be an especially mitigated offender if the defendant has no prior felony convictions and if the court finds mitigating but no enhancement factors. Tenn. Code Ann. § 40-35-109 (2003). This provision is not mandatory but rather is discretionary. *State*

*v. Braden*, 867 S.W.2d 750, 762 (Tenn. Crim. App. 1993); Tenn. Code Ann. § 40-35-109, Sentencing Commission Comments. Whether a defendant is to be sentenced as an especially mitigated offender is a determination that rests within the sound discretion of the trial court. *State v. Hicks*, 868 S.W.2d 729, 730-31 (Tenn. Crim. App. 1993). It has been noted that finding a defendant to be an especially mitigated offender is reserved for "instances where the trial judge may desire to depart from even the minimum sentence for a Range I offender and impose lesser penalties." Tenn. Code Ann. § 40-35-109, Sentencing Commission Comments. In the present case, the trial court found that the Appellant's deliberate acts, in the commission of a crime which "placed people in fear" and which was accomplished by a deadly weapon, were of such a nature as to deny the Appellant mitigated offender status. The Appellant has not persuaded us that the trial court abused its discretion by not finding him to be an especially mitigated offender. *See State v. Scarlet Rose Bender*, No. M2000-1070-CCA-R3-CD (Tenn. Crim. App. at Nashville, Oct. 13, 2000).

## CONCLUSION

Based upon the foregoing, the judgment of conviction and resulting sentence of the Anderson County Criminal Court are affirmed.

_____
DAVID G. HAYES, JUDGE

-12-